Argued and submitted April 8, at David Douglas High School, Portland, reversed and remanded June 26, 2003

Tess SIMONS,
*Appellant,*

*v.*

Duane BEARD, M.D.;
and Salem Hospital,
an Oregon nonprofit corporation,
*Respondents.*

00C-13519; A114365

72 P3d 96

Kathryn H. Clarke argued the cause for appellant. With her on the briefs was Gregory A. Smith.

Ruth Casby Rocker argued the cause for respondent Duane Beard, M.D. With her on the brief were Janet M. Schroer and Hoffman, Hart & Wagner, LLP.

Keith J. Bauer argued the cause for respondent Salem Hospital. With him on the brief was Parks, Bauer, Sime & Winkler, LLP.

Before Haselton, Presiding Judge, and Deits, Chief Judge, and Wollheim, Judge.

HASELTON, P. J.

## HASELTON, P. J.

Plaintiff appeals from the dismissal, pursuant to ORCP 21 A(8) and B, of her amended complaint seeking damages for emotional distress that she experienced as a result of defendants' allegedly negligent provision of obstetrical care. In reviewing that dismissal, we assume the truth of all well-pleaded facts in the amended complaint and give plaintiff the benefit of all reasonable inferences that can be drawn in her favor. *See Greene v. Legacy Emanuel Hospital*, 165 Or App 543, 545, 997 P2d 265 (2000), *aff'd*, 335 Or 115, 60 P3d 535 (2002). Applying that standard, we conclude that the amended complaint stated a claim for recovery of emotional distress damages under the "physical impact" rule. Accordingly, we reverse and remand.

Plaintiff's amended complaint alleged the following material facts: On May 30, 1998, plaintiff went into labor at full term and entered defendant Salem Hospital. Electronic fetal monitoring showed that plaintiff's fetus had borderline tachycardia (a high pulse rate), which alternated with abnormal decreases in the fetus's heart rate. Defendant Dr. Duane Beard, plaintiff's treating obstetrician, examined her and determined that the fetus was in a "transverse lie" position. That is, that, instead of being in the normal "head down" position, the fetus was lying sideways to the birth canal.

As alleged in the amended complaint, defendants knew or should have known that

"such a transverse lie makes spontaneous delivery of a fully developed infant impossible and that such a position greatly increases both maternal and fetal risk of death if not corrected prior to the onset of active labor."

Given those circumstances, defendants knew, or should have known that

"attempts to 'tip' the baby into a head-down position (*i.e.*, version) were mandatory * * * [and] continued observation of both mother and unborn child in the hospital with continuous fetal monitoring was necessary to determine if and when the unborn child went into fetal distress, thus requiring immediate medical and/or surgical (*i.e.*, Cesarean section) care."

Notwithstanding those risks, defendant Beard discharged plaintiff from the hospital without ordering further tests or monitoring and without attempting to reposition the fetus into a position that would permit spontaneous vaginal delivery.

Several hours later, in the early morning of May 31, plaintiff called the hospital to inform the obstetrical nurses that her membranes had ruptured and her mucous plug had become dislodged. The nurses told plaintiff not to return to the hospital until her contractions became stronger or more frequent. Plaintiff returned to the hospital several hours later. At that time, an ultrasound examination revealed that the fetus had died. Defendant Beard subsequently returned to the hospital and repositioned the fetus to correct the transverse lie, and plaintiff then vaginally delivered the dead child.

In April 2000, plaintiff brought this action. In her amended complaint, plaintiff alleged that, as a result of defendants' negligence described above, she

"was caused to suffer the continued impact of her unborn child's transverse lie across the upper part of her birth canal which caused severe apprehension as to the safety and well being of herself and her child [resulting] in Plaintiff suffering extreme emotional trauma * * *."

Plaintiff further alleged that defendants' negligence "was a substantial and foreseeable factor in causing the prolonged and improper impact (transverse lie) of Plaintiff's baby upon her birth canal, her emotional distress and the loss of her baby."[1]

Defendant Beard moved to dismiss for failure to state a claim, ORCP 21 A(8), and defendant Salem Hospital moved for judgment on the pleadings, ORCP 21 B. Defendants advanced three alternative, but related, arguments: (1) Plaintiff's action was barred under Oregon's wrongful death statutes. That was so because, however styled, plaintiff's claim sought to recover emotional distress damages for

---

[1] As described below, the parties agreed that, for purposes of ruling on defendants' Rule 21 motions, the trial court should assume that the phrase "the loss of her baby" had been amended by interlineation to read "her miscarriage."

the alleged wrongful death of her unborn child, and Oregon law does not permit such a recovery. *See* ORS 30.020(2)(d); *Horwell v. Oregon Episcopal School*, 100 Or App 571, 574-75, 787 P2d 502 (1990).[2] (2) Plaintiff's amended complaint failed to allege a legally sufficient basis for the recovery of emotional distress damages under the "physical impact" rule. *See, e.g., Saechao v. Matsakoun*, 78 Or App 340, 717 P2d 165, *rev dismissed*, 302 Or 155 (1986). (3) Plaintiff's amended complaint failed to allege a legally sufficient claim for medical malpractice permitting the recovery of emotional distress damages. *See generally Curtis v. MRI Imaging Services II*, 327 Or 9, 956 P2d 960 (1998); *Rustvold v. Taylor*, 171 Or App 128, 14 P3d 675 (2000), *rev withdrawn*, 332 Or 305 (2001).[3]

Plaintiff responded by acknowledging that, under *Horwell*, she could not recover emotional distress damages for "the loss of her baby." She argued, however, that she had adequately pleaded a distinct claim for her own suffering and emotional distress, based on the alternative theories that she was a direct victim of defendants' professional negligence or that she had suffered a physical impact as a result of that negligence sufficient to permit her to recover for negligent infliction of emotional distress. In that regard, plaintiff's counsel offered the following explanations during colloquy with the trial court:

"[The claim is] for the miscarriage. It's emotional distress based on a miscarriage. It is clearly not, nor could it be for the loss of the baby * * *.

"* * * * *

"[The claim] brought by the mother regarding the negligent care provided to her directly by Dr. Beard in the hospital seeks a claim not for loss of the child, but for emotional distress damages as a result of her suffering a miscarriage caused by medical negligence."

---

[2] Plaintiff's husband, as personal representative of their dead child, did file a separate wrongful death action pursuant to ORS 30.020. *See generally Libbee v. Permanente Clinic*, 268 Or 258, 518 P2d 636 (1974) (wrongful death action is available for death of viable fetus). ORS 30.020(2)(d) provides that the decedent's parents may recover damages for, *inter alia*, "loss of the society, companionship and services of the decedent."

[3] *See also Rathgeber v. James Hemenway, Inc.*, 335 Or 404, 416-18, 69 P3d 710 (2003) (reiterating *Curtis*'s requirements).

As support for the proposition that plaintiff could recover damages for emotional distress associated with the "miscarriage," counsel invoked *Saechao* and *Sherwood v. ODOT*, 170 Or App 66, 11 P3d 664 (2000), *rev den*, 331 Or 692 (2001). Plaintiff's counsel then concluded, "[T]he Oregon law, even cited by the defendants, show[s] that an action for miscarriage is appropriate. We've alleged all along that plaintiff seeks emotional harm damages relating to the termination of this pregnancy."[4]

The trial court agreed with defendants, concluding that the pleadings contained no allegations that plaintiff "suffered an injury causing a miscarriage." The court also referred to a dictionary definition of "miscarriage" as "expulsion of a human fetus before it is viable and esp. between the 12th and 28th weeks of gestation"[5]—and, at least implicitly, determined that, because plaintiff had not suffered a "miscarriage" under that definition, she could not recover damages for her apprehension about the well-being of her unborn child.

On appeal, plaintiff asserts that her amended complaint is legally sufficient to support the recovery of emotional distress damages under either of two alternative theories. First, and more broadly, plaintiff contends that her pleadings state a claim under the "physical impact" rule. Second, even if the amended complaint does not allege an actionable "physical impact," its allegations of medical negligence are nevertheless sufficient under *Curtis* to support the recovery of emotional distress damages.

■ We begin with plaintiff's "physical impact"-related theory of recovery. In general, albeit subject to limited exceptions, *e.g., Curtis*, Oregon courts do not permit the recovery of damages for negligently inflicted emotional distress in the absence of evidence of some related physical injury. *See generally Hammond v. Central Lane Communications Center*,

---

[4] The colloquy between the court and counsel shows that the court accepted plaintiff's substitution of "miscarriage" for "the loss of the baby" for purposes of deciding the Rule 21 motion.

[5] *See Merriam-Webster's Collegiate Dictionary* 743 (10th ed 1999).

312 Or 17, 816 P2d 593 (1991). In *Chouinard v. Health Ventures*, 179 Or App 507, 514-15, 39 P3d 951 (2002), we explored the contours of the "physical impact" requirement:

> "Neither the Supreme Court nor we have sought to define the minimum amount of bodily harm necessary to constitute a physical impact. *See Shoemaker v. Management Recruiters International*, 125 Or App 568, 573-74, 865 P2d 1131 (1993). In *Hammond*, however, the Supreme Court declined the plaintiff's invitation to depart from its cases requiring a physical impact as a prerequisite to recovery for negligently inflicted emotional distress. 312 Or at 26-27. The court's adherence to its precedent suggests that its earlier opinions, which required some form of physical injury, remain good law. *See Fehely v. Senders*, 170 Or 457, 461, 135 P2d 283 (1943). Consistently with *Fehely*, we have referred to the physical impact rule as requiring a 'physical injury' that gives rise to emotional distress. *See Rustvold v. Taylor*, 171 Or App 128, 137, 14 P3d 675 (2000); *Curtis v. MRI Imaging Services II*, 148 Or App 607, 612, 941 P2d 602 (1997), *aff'd· on other grounds* 327 Or 9, 956 P2d 960 (1998). We have recognized, however, that the notion of a physical injury also includes offensive sexual touching that gives rise to emotional distress. *Wilson v. Tobiassen*, 97 Or App 527, 532, 777 P2d 1379, *rev den* 308 Or 500 (1989); *see Shoemaker*, 125 Or App at 573-74 (describing the offensive touching in both *Wilson* and that case as a form of 'sexual molest[ation]').
>
> "At a minimum, the physical impact rule requires an act or omission that results in some perceptible physical effect on a plaintiff. We need not decide whether more is required to constitute a sufficient physical impact to warrant recovery of emotional distress damages."

(Footnote omitted.)

■ Here, we need not answer the question that *Chouinard* deferred. Wherever the outer limits of the "physical impact" requirement may lie, plaintiff's amended complaint alleges facts, with attendant reasonable inferences, that fall well within its scope. Specifically, plaintiff's amended complaint alleges that defendants' negligence in failing to correct the transverse lie resulted in "prolonged and improper impact" of the fetus upon the birth canal and "greatly increase[d] both *maternal* and fetal risk of death if

not corrected prior to the onset of active labor." (Emphasis added.) The amended complaint also alleges that "continuou[s] fetal monitoring was necessary to determine if and when the unborn child went into fetal distress, thus requiring immediate medical and/or surgical (*i.e.*, Cesarean section) care." The amended complaint further alleges that, even after plaintiff's mucous plug became dislodged, and even as the fetus remained in a position from which spontaneous delivery was "impossible," plaintiff was denied admission to the hospital. Finally, as pertinent to "physical impact," the amended complaint alleges that defendant Beard corrected the transverse lie only after the fetus had died and that plaintiff then delivered her dead child vaginally.

■　　We reiterate, and emphasize, that this case is before us on a Rule 21 dismissal—and, thus, we are to give plaintiff the benefit of all favorable inferences that may reasonably be drawn from the allegations of the amended complaint. *See Greene*, 165 Or App at 545. So viewed, those allegations would permit a trier of fact to find, either directly or inferentially, that (1) because of defendants' negligence, plaintiff began labor with the abnormal transverse lie uncorrected and the fetus in unmonitored distress, exposing plaintiff to a "greatly increased" risk of death; and (2) but for defendants' negligence, plaintiff could have, and would have, either experienced a vaginal delivery of a live child or undergone an emergency Cesarean section—and, thus, plaintiff would not have experienced the physical trauma of her unnecessarily protracted and ultimately futile labor.

Defendants maintain, nevertheless, that those allegations are legally insufficient to state the requisite "physical impact." Defendants' position is, in effect, that plaintiff was going to have to deliver the child one way or another, and the only "physical impact" she suffered was the impact of "the normal birth process" that she would have experienced regardless of their allegedly negligent actions.

Defendants' argument ignores that this case is before us on a Rule 21 dismissal. To be sure, after the presentation of evidence, a trier of fact might agree with defendants that the physical impact that plaintiff experienced

here was no different than she would have otherwise. Conversely, the trier of fact could agree with plaintiff's inferential premise that, but for defendants' negligence, the birth process would have gone very differently—either a Cesarean section or an unobstructed vaginal delivery—and that the physical impact to plaintiff from her protracted labor, including her ultimate delivery of the dead child, differed materially from the impact that plaintiff would have experienced if defendants had acted nonnegligently.[6] We thus conclude that the amended complaint sufficiently alleges that plaintiff suffered physical injury as a result of defendants' negligence, permitting recovery of emotional distress damages.

Defendants contend, however, that, regardless of the sufficiency of plaintiff's pleading of "physical impact," her claim is barred under the wrongful death statutes. In particular, defendants posit that plaintiff's action is simply a vehicle to recover emotional distress damages for the death of her child and that the wrongful death statutes, which are exclusive, preclude such a recovery. *See* ORS 30.010 ("[a] parent may recover damages for the death of his or her child only under" the wrongful death statutes); *Horwell*, 100 Or App at 575 (emotional distress damages for parent's death were not recoverable in a wrongful death action and, by extension, could not be recoverable through a claim for negligent infliction of emotional distress arising from the parent's death).

---

[6] *Chouinard*, which defendants invoke, is materially distinguishable. There, we affirmed the trial court's grant of a directed verdict in favor of the defendants, a neuroradiologist and a radiological care provider, against the plaintiff's claim that the defendants had negligently failed to detect and diagnose a brain tumor. In so holding, we rejected the plaintiff's argument that the mere undetected growth of the tumor within her body could, by itself, constitute a sufficient "physical impact" permitting the recovery of emotional distress damages. 179 Or App at 513-15. In that regard, we emphasized that, in opposing the directed verdict, the plaintiff had not adduced any evidence that various symptoms she had experienced were, in fact, causally related to the tumor. Thus, there was no evidence of a "perceptible physical effect" on the plaintiff as a result of the defendants' alleged neligence. *Id.* at 515.

Here, in contrast, a trier of fact could determine upon proof of the allegations of the amended complaint that defendants' alleged malpractice did cause plaintiff to experience a physical impact far transcending some minimal "perceptible physical effect." Specifically, the trier of fact could find that but for defendants' negligence, plaintiff would not have experienced the physical trauma of unnecessarily protracted, and ultimately futile, labor and delivery.

Defendants misunderstand the nature of the recovery that plaintiff seeks. The amended complaint alleges that, because of defendants' negligence, plaintiff "was caused to suffer the continued impact of her unborn child's transverse lie across the upper part of her birth canal which caused severe apprehension as to the safety and well being of herself and her child." Moreover, as noted, in colloquy with the trial court, plaintiff's counsel repeatedly acknowledged that plaintiff could not, and was not attempting to, recover emotional distress damages for the death of the child—but, instead, only for the "miscarriage," *i.e.*, "the termination of this pregnancy." Thus, as pleaded and as amplified in plaintiff's counsel's colloquy with the trial court, plaintiff seeks to recover emotional distress damages arising from (1) her negligently protracted and futile labor; and (2) her apprehension about the fate of her unborn child. Each is distinct from a wrongful death-based recovery of emotional distress damages. Each is properly recoverable.

With respect to the first component, plaintiff's alleged emotional distress is qualitatively no different from the distress experienced by any patient who has been subjected to unnecessary, or unnecessarily prolonged, physical trauma as a result of alleged medical malpractice. The fact that the alleged malpractice also resulted in fetal death, giving rise to a wrongful death claim, does not alter the nature—and recoverability—of plaintiff's distress resulting from the physical injury that she suffered.

Plaintiff's ability to recover emotional distress damages resulting from apprehension about the well-being of her unborn child presents a closer question. At the outset, we emphasize our understanding, derived both from the language of the pleadings and from counsel's explanatory representations and colloquy with the trial court, that the complaint does *not* seek damages for plaintiff's emotional distress from the death of the child. Rather, her claim pertains solely to apprehension about the child antedating the child's death. As so circumscribed, plaintiff's complaint supports the recovery of such damages. *See Fehely v. Senders*, 170 Or 457, 461, 135 P2d 283 (1943).

*Fehely* is dispositive. There, the plaintiff was injured in a car accident in the sixth month of her pregnancy. After the accident, the plaintiff "was afraid of what the blow on her abdomen might do to the child or might do to herself. This apprehension continued until the baby came and for a few days thereafter." 170 Or at 460. The baby was born healthy "there was a normal delivery and normal baby." *Id.*

In the subsequent litigation arising from the auto accident, the trial court, over a defense objection, permitted the plaintiff to testify about her apprehension regarding her child's well-being after the accident and throughout the course of the pregnancy. The jury returned a verdict for plaintiff.

On appeal, the Supreme Court framed the question as follows:

"[W]hether the apprehension (which in this instance proved to be groundless) of a pregnant woman that her child may be born dead or deformed as the result of an injury to her person is an element of damage."

*Fehely*, 170 Or at 460. Ultimately, after canvassing the law of several jurisdictions pertaining to the recoverability of emotional distress damages, the court concluded, "We think that apprehension of that sort is the natural consequence of a blow on the abdomen such as the plaintiff suffered, or at least that a jury could so find, and that it could be mental distress the most acute." *Id.* at 474.

Defendants attempt to distinguish *Fehely* on two grounds. First, they contend that *Fehely*'s reasoning applies only to instances in which the mother sustains an injury that endangers a *nonviable* fetus. However, nothing in *Fehely* suggests, much less expresses, any such limitation. Indeed, in *Fehely* itself, the plaintiff was permitted to testify about her apprehension throughout the course of the pregnancy, which, in turn, permitted the jury to award damages for the apprehension-related distress that the plaintiff suffered even after her child became viable. We perceive no distinction between permitting that recovery and permitting recovery where, as here, the apprehension-causing injury occurred after the plaintiff's child became viable.

Second, defendants contend that the *sine qua non* of liability under *Fehely* is that the plaintiff must have suffered physical injury that reasonably gave rise to apprehension about the unborn child's well being—and that here, plaintiff suffered no such injury. That argument is, essentially, a reprise of defendants' "no physical impact" argument, and we reject it for the same reasons. Upon proof of the facts alleged in the pleadings, a trier of fact could reasonably find that plaintiff's apprehension about her unborn child's well-being was the "natural consequence" of plaintiff's tortiously protracted labor that preceded the child's death. *See Fehely*, 170 Or at 474.

■ ■    Finally, for purposes of providing guidance on remand, we briefly address the sufficiency of plaintiff's pleadings with respect to her alternative, medical malpractice-based theory of recovery. Under *Curtis, Rustvold*, and related cases, a plaintiff may recover for negligent infliction of emotional distress, even in the absence of any cognizable physical impact, if the defendant care provider breached a "specific duty to be aware of and guard against particular adverse psychological reactions or consequences to medical procedures." *Curtis*, 327 Or at 14-15. As the court explained in *Curtis*:

> "We are persuaded that, when the claim is that a medical practitioner breached a professional duty to guard against a specific medical harm, the fact that that harm is psychological rather than physical is not a bar to liability. Our holding should not be read to mean that medical professionals operate under a general duty to avoid any emotional harm that foreseeably might result from their conduct. In that regard, their duty is no greater than that of the population at large. But, where the standard of care in a particular medical profession recognizes the possibility of adverse psychological reactions or consequences as a medical concern and dictates that certain precautions be taken to avoid or minimize it, the law will not insulate persons in that profession from liability if they fail in those duties, thereby causing the contemplated harm."

*Id.* at 15-16; *see also Rathgeber*, 335 Or at 418 ("It is always foreseeable that some emotional harm might result from the negligent performance of real estate professional services, as

it might from legal, accounting, or other varieties of professional malpractice. That possibility, however, cannot give rise to emotional distress damages unless a standard of care that includes the duty to protect a client from emotional harm governs the professional's conduct."); *Rustvold*, 171 Or App at 135 (holding that the plaintiff's pleadings alleged nothing more than that "emotional distress is a foreseeable consequence of [the] defendants' negligence" and, thus, were legally insufficient to support recovery of emotional distress damages under *Curtis*'s rationale).

■     Applying those standards, we agree with defendants that, if the trier of fact were to determine that plaintiff did not experience a cognizable physical impact, plaintiff's amended complaint would, as presently pleaded, be legally insufficient to permit an award of emotional distress damages under an alternative *Curtis*-based theory of recovery. As described in detail above, plaintiff's amended complaint alleges that defendants' conduct, including the failure to correct the transverse lie and to engage in continuous monitoring, foreseeably increased the risk of serious injury or death for both plaintiff and her unborn child. However, those pleadings do not allege that defendants were subject to, and breached, a specific professional duty to alleviate potential psychological harm resulting from the consequences of obstetrical care, including fetal distress.

To be sure, the pleadings raise an inference that emotional distress was *generally* foreseeable under the circumstances alleged. But, under *Curtis, Rathgeber*, and *Rustvold*, that is not enough. Nor are the pleadings sufficient to support an inference of a specific professional duty to avoid such professional harm. *See, e.g., Rathgeber*, 335 Or at 418; *Rustvold*, 171 Or App at 135.[7] Consequently, plaintiff's

---

[7] Indeed, the insufficiency of plaintiff's pleadings under *Curtis* is best illustrated by way of contrast with *Curtis* itself. In *Curtis*, the complaint included allegations that the defendants had failed to warn the plaintiff of claustrophobia—a psychological condition—before placing him, and leaving him helpless, in a closely confined space. From those allegations, a trier of fact could reasonably infer that the defendants knew or should have known that performing the MRI procedure could lead to claustrophobia and that they should have taken steps to prevent the plaintiff from suffering that specific psychological harm during the procedure.

amended complaint does not state a legally sufficient alternative claim for recovery of emotional distress damages, based on medical malpractice, under *Curtis*.

Reversed and remanded.